# Exhibit B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Alan Napoli,

Plaintiff,

-against-

Deluxe Corporation and Deluxe Small Business
Sales, Inc.

Defendants.

Docket No.  17-cv-6957(SJF)

**VERIFIED ANSWER WITH
AFFIRMATIVE DEFENSES AND
COUNTERCLAIMS**

Defendants, Deluxe Corporation ("Deluxe Corp.") and Deluxe Small Business Sales, Inc. ("Deluxe SBS") (collectively, "Deluxe" or "Defendants"), by and through their attorney, Hinshaw & Culbertson LLP, for its answer to plaintiff Alan Napoli's ("Napoli" or "Plaintff") Verified Complaint (the "Complaint"), states as follows:

1.      Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations pertaining to Plaintiff's residence as alleged in Paragraph 1 of the Complaint.  To the extent these allegations infer the existence of facts supporting a claim for relief against Defendants, they are denied.

2.      Admits the allegations contained in Paragraph 2 of the Complaint.

3.      Admits the allegations contained in Paragraph 3 of the Complaint to the extent that Deluxe SBS is organized under the laws of the State of Minnesota, but denies the remaining allegations.

4.      Denies the allegations contained in Paragraph 4 of the Complaint.

## IN RESPONSE TO THE ALLEGATIONS UNDER THE HEADING
## "JURISDICTION"

5.     The allegations contained in Paragraph 5 of the Complaint purport to state conclusions of law which do not require a response.  To the extent these allegations infer the existence of facts supporting a claim for relief against Defendants, they are denied.

## IN RESPONSE TO THE ALLEGATIONS UNDER THE HEADING
## "FACTS"

6.     Admits the allegations contained in Paragraph 6 of the Complaint to the extent Plaintiff is alleging that he provided services to Deluxe SBS as a commissioned salesperson from on or about June 1, 2016 to on or about March 31, 2016.

7.     Admits the allegations contained in Paragraph 7 of the Complaint to the extent Plaintiff is alleging that he signed a letter, dated May 17, 2016, on May 20, 2016, but denies that a copy of that letter is annexed to the Complaint as an Exhibit.  In further response to the allegations in Paragraph 7 of the Complaint, Defendants respectfully refer the Court to the documents annexed hereto as Exhibit A and B for their content and legal import, if any.

8.     Admits the allegations contained in Paragraph 8 of the Complaint and respectfully refers the Court to the documents annexed hereto as Exhibit A and B for their content and legal import, if any.

9.     Admits the allegations in Paragraph 9 of the Complaint to the extent Plaintiff is alleging he was a commissioned salesperson with an annual draw of $100,000.  In further response to the allegations in Paragraph 9 of the Complaint, Defendants respectfully refer the Court to the document annexed hereto as Exhibit A for its content and legal import, if any.

10.     Admits the allegations contained in Paragraph 10 of the Complaint.

11.     Admits the allegations contained in Paragraph 11 of the Complaint.

12.     Admits the allegations contained in Paragraph 12 of the Complaint.

301898503v1 1004654

13.     Admits the allegations contained in Paragraph 13 of the Complaint.

14.     Admits the allegations contained in Paragraph 14 of the Complaint.

15.     Admits the allegations contained in Paragraph 15 of the Complaint.

16.     Denies the allegations contained in Paragraph 16 of the Complaint and respectfully refers the Court to the documents annexed hereto as Exhibit A, B and C for their content and legal import, if any.

## IN RESPONSE TO THE ALLEGATIONS UNDER THE HEADING "FIRST CAUSE OF ACTION"

17.     In response to the allegations contained in Paragraph 17 of the Complaint, Defendants restate each of its responses to the proceeding multiple Paragraphs 1 through 16 above, as if fully restated and realleged herein.

18.     In response to the allegations contained in Paragraph 18 of the Complaint, Defendants respectfully refer the Court to documents annexed hereto as Exhibits A and B for their content and legal import, if any.

19.     Denies the allegations contained in Paragraph 19 of the Complaint.

20.     Denies the allegations contained in Paragraph 20 of the Complaint.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part because he fails to state claims upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because he has not complied with all contractual condition precedents to be entitled to severance benefits.

3

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Defendants properly discharged their contractual obligations to him.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because his breach of contract claim is contradicted by the terms of the agreement he is seeking to enforce.

## FIFTH AFFIRMATION DEFENSE

Plaintiff's claims are barred, in whole or in part, by waiver, estoppel and/or unclean hands.

## SIXTH AFFIRMATIVE DEFENSE

Defendants hereby reserve any and all rights they may have to raise additional defenses or that may otherwise be developed through the course of discovery in this litigation.

## <u>COUNTERCLAIMS</u>

Defendants hereby assert the following as counterclaims against Plaintiff:

1.     On or about June 1, 2016, L.A.M. Enterprises, Inc. ("LAM") sold its assets to Deluxe SBS.

2.     Plaintiff was or is an officer of LAM.

3.     Prior to the sale of LAM's assets to Deluxe SBS, Plaintiff was offered and accepted a position with Deluxe SBS as a commissioned salesperson. *See* Exhibits A and B.

4.     On or about March 17, 2017, Safeguard Acquisition, Inc. purchased the assets previously belonging to LAM from Deluxe SBS, which then sold the assets to Safeguard Marketing Solutions USA, Inc. ("Safeguard").

301898503v1 1004654

5.     On or about that same time, Safeguard offered Plaintiff a position as a commissioned salesperson.  *See* Exhibit C.

6.     In connection with the offer from Safeguard, Plaintiff sought legal advice from an attorney.

7.     The cost of the legal services Plaintiff obtained in connection with Safeguard's offer amounted to $4,462.50.  Defendants respectfully refer the Court to the document annexed hereto as Exhibit D.

8.     Plaintiff used $4,462.50 from a bank account containing funds owed to Deluxe Corp. to pay the costs of the legal services he obtained in connection with Safeguard's offer.

9.     Plaintiff retained, removed, caused to be removed or knew that $4,462.50 had been removed or used from a bank account containing funds owed to Deluxe Corp. without Defendants' authorization or permission.

10.     Plaintiff accepted the offer extended to him by Safeguard.  *See* Exhibit C.

11.     Deluxe Corp. inquired about the missing funds and was informed by Plaintiff's wife, Lena Napoli, who was or is President of LAM, in an email, dated September 18, 2017, that the funds owed to Deluxe Corp. had been used in connection with "[Plaintiff's] negotiations with Deluxe for his exit from Deluxe to Safeguard."  Defendants respectfully refer the Court to the document annexed hereto as Exhibit E.

12.     Defendants demanded the return of the $4,462.50 owed to Deluxe Corp., but Plaintiff refused to return them.

## FIRST COUNT
### (for Conversion)

13.     Defendants repeat and reallege the allegations contained in the foregoing paragraphs as if fully set forth herein.

5

14.    Plaintiff, without right or permission from Defendants, improperly exercised control over and converted for his own use funds owed to Deluxe Corp.

15.    Defendants are entitled to the immediate return of those funds, with interest.

**SECOND COUNT**
(for Unjust Enrichment)

16.    Defendants repeat and reallege the allegations contained in the foregoing paragraphs as if fully set forth herein.

17.    Plaintiff has been unjustly enriched in the amount of $4,462.50, which Plaintiff has refused to return.

18.    Plaintiff, in equity and good conscience, should pay to Deluxe Corp., as a result of Plaintiff's unjust enrichment, $4,462.50, with interest.

301898503v1 1004654

**WHEREFORE**, Defendants pray that this Court:

1.      Dismiss the Complaint in its entirety and with prejudice;

2.      award damages on the Counterclaims in an amount to be proven at trial, but which is not less than $4,462.50; and

3.      grant such other and further relief as is just and proper.

Dated: New York, New York
       May 18, 2018

                                        Respectfully submitted,
                                        *Attorneys for Defendants Deluxe Corporation and*
                                        *Deluxe Small Business Sales, Inc.*

                              By:   *s/Jason J. Oliveri*
                                    _____
                                    Jason J. Oliveri
                                    HINSHAW & CULBERTSON LLP
                                    800 Third Avenue, 13th Floor
                                    New York, NY 10022
                                    Tel:    212-471-6200
                                    Fax:    212-935-1166
                                    E-mail: joliveri@hinshawlaw.com

TO:    Jeffrey Ettenger, Esq.
       Schwartz Ettenger, PLLC
       445 Broad Hollow Road, Suite 205
       Melville, New York 11747
       (631) 777-2401

301898503v1 1004654

## ATTORNEY'S VERIFICATION

I, the undersigned, an attorney admitted to practice law in the courts of New York, affirm under penalties of perjury as follows:

I am the attorney of record for defendants Deluxe Corporation ("Deluxe Corp.") and Deluxe Small Business Sales, Inc. ("Deluxe SBS") (collectively, "Deluxe" or "Defendants"), and have read the annexed Verified Answer with Affirmative Defenses and Counterclaims. I know the contents thereof and the same are true to my knowledge, except those matters therein which are stated upon information and belief, and as to those matters I believe them to be true. My belief, as to those matters therein not stated upon knowledge, is based upon the following: files, records and information provided by representatives of Deluxe.

The reason I make this affirmation instead of Deluxe is that Deluxe is not in the County in which my office is located.

Dated: New York, New York
     May 18, 2018

*s/Jason J. Oliveri*
Jason J. Oliveri

8

# EXHIBIT A



May 17, 2016

Alan Napoli
19 Trescott Street
Dix Hills, NY 11746

Dear Alan:

I am pleased to extend to you an offer of employment for the position of Sales with Deluxe Small Business Sales, Inc., doing business as Range, a Deluxe Company.  Your sales position responsibilities will include the solicitation of new customers and management of existing customers of L.A.M. Enterprises, Inc. This position will report to me and you will be a remote employee working from your home office. I am excited for you to begin employment with the team on June 1st, 2016 provided that the acquisition of L.A.M. Enterprises, Inc. has closed by that date.

To begin your orientation and learn more about Deluxe, including your status as an employee-at-will, and Deluxe benefits including; Compensation, Health & Insurance, and Retirement plans visit www.deluxe.com/neo.

## Compensation
Commission plans are reviewed on an annual basis to ensure the plan structures continue to support the business objectives.  In this position you will be paid a draw against commission of $4,166.66 semi-monthly (for an annual equivalent of $100,000), less required and authorized deductions and withholdings. This draw will be deducted from your commissions on a monthly basis. The commission calculation and definitions are provided in Attachment A to this letter.

## Benefits
Upon employment, you will be eligible for the full range of Deluxe employee benefit plans, including life, medical, dental, vision, short and long-term disability.  Each of these plans has a specific waiting period and other requirements for participation.  See enclosed Benefits Summary for details.

## Retirement Plan
The Company's Retirement Plan is made up of a 401(k) plan, which you will be eligible to participate in, subject to the terms and conditions of such plan.  See enclosed Benefits Summary for details.

## Background Investigation and Drug Screening
Employment is contingent upon satisfactory results of a background investigation and drug screen that we will arrange prior to closing on the purchase of the assets of your company.

## Confidentiality
This offer is contingent upon your acceptance of the enclosed Confidentiality Agreement.  The agreement must be signed and returned to me prior to your commencement of work for the Company.

## Severance Support Plan
In the event of the involuntary termination of your employment by the Company, other than termination by the Company "for cause" (defined below) and upon providing us with an unrescinded release, you will be

eligible to receive severance per Deluxe' s current severance support plan policy, but at least an amount equal to 9 months of base draw, less applicable taxes and other required withholdings and any amount you may owe to the Company, payable in the manner and at the time you received your draw payments as an employee of the Company.  Plus if not employed after the 9 month period, you will be eligible to receive 3 months of base draw continuation, less applicable taxes and other required withholdings and any amount you may owe to the Company. If employed but at a rate less than most recent Deluxe base draw, you will be eligible for  the difference between the Deluxe draw and the current monthly compensation for 3 months.  Note, while Deluxe reserves the right to change our severance support plan policy at any time, your severance benefits will be no less than those provided for herein.

Please note that your employment may be terminated by the Company for cause at any time, without notice or pay in lieu of notice. "For Cause" means the occurrence of any of the following:  (i) theft, dishonesty, embezzlement or fraud by you, (ii) gross insubordination, (iii) serious misconduct, (iv) a false statement on either of your resume or employment application, or (v) conviction of any felony or of any crime involving moral turpitude, as well as any other conduct which would constitute cause at law.

In addition, you may voluntarily terminate or resign from your employment with the Company at any time by providing reasonable written notice to the Company.  In such event you shall only be entitled to any outstanding salary and earned but unpaid commissions, due to you at the effective date of your voluntary termination or resignation.

This offer reflects the general description of the terms and conditions of your employment with Deluxe, and is not a contract of employment for any definite duration of time.  The employment relationship with Deluxe is by mutual consent ("employment at will").  This means either you or Deluxe have the right to discontinue the employment relationship with or without cause at any time and for any reason.

## Forms

Enclosed are several forms I need you to complete and return to me as soon as possible.

On your first day of work, please bring appropriate documentation to complete your I-9 form.  For details please visit http://www.uscis.gov/files/form/i-9.pdf.

Please return a duplicate original of this letter and the enclosed Confidentiality Agreement signed by you prior to your start date.

Alan, I am confident that you will make a significant contribution to Deluxe.  I am pleased to be making this offer to you and look forward to working with you.  Please let me know if I can provide more information.

Sincerely,


Fritz Wuenschel
Sr. Director Company Owned

Acceptance: _____      Date: _5 / 20 / 16_
                        Alan Napoli


cc:      Employee File
         Carla Cannon

**Attachment A**

Commission Calculation and Definitions:

Your commissions will be calculated on the basis of 30% of the first $565,000 of Gross Profit (as defined) generated from sales to your accounts, and 50% of Gross Profit thereafter for your accounts.

Commissions for sales during a calendar month will be paid to you on or before the 15th of the following month.

All of the accounts acquired in connection with the purchase of the LAM assets will be assigned to you.

Your draw and your commission plan may be reviewed and modified no sooner than January 1, 2019.

Definition of Gross Profit:

For purposes of this Agreement, the term "Gross Profit" will mean the selling price of the goods sold (excluding shipping costs and taxes) less the actual cost of the goods (which if manufactured by Deluxe, will be limited to the cost to produce the goods).

The payment of commissions will be accompanied by a commission report, which will include the sale price, the cost of goods, any other monies received by the Company in connection with the sale of the goods, as well as the calculation of the commissions paid.

The Company will not charge you back for any nonpayment by the Company's customers until the receivable is at least 120 days past due. In the event of a chargeback for non-payment, you will be entitled to payment of the commission if and when payment is received by the Company, based on the amount collected. Upon request, you or your representative will be entitled to all information underlying the sales to your accounts in order to verify that the calculation of your commissions was done properly.

CONFIDENTIAL

# EXHIBIT B

**DELUXE**

HUMAN RESOURCES
POLICY

> This HR Library is a guide to the company's policies. It does not create a contract of employment for any length of time, nor does it change the at-will nature of employment. Some of the policies described may require further interpretation, and some may vary according to business area policy. The Company reserves the right to add, modify or terminate its employee policies, practices and procedures and/or benefits at any time.

# SEVERANCE SUPPORT PLAN

## PURPOSE

To describe the benefit program bridging an eligible terminated employee to outside employment.

## SCOPE

Applies to full-time and specifically defined part-time employees of Deluxe Corporation and each of its affiliates ("the Company").

## DEFINITIONS

| Term | Definition |
|---|---|
| Release Date | Date employment with Deluxe and/or a Deluxe entity ends for an employee. |
| Part-Time Employee | An employee scheduled to work 20 or more and fewer than 32 hours per week. |
| COBRA | Consolidated Omnibus Budget Reconciliation Act; plan allows for continuation of certain group benefits. |
| Years of Service | The number of complete years of actual service, taking into account absences and part-time status. Portions of Years of Service will not be counted. |
| Base Pay | Regular earnings for a week not to exceed 40 hours. Does not include overtime, shift differential, incentive, deferred, bonus compensation or retirement plan contributions. Commission-based pay will be determined by calculating average weekly earnings over a reasonable previous period of time (generally 12 months). Performance or merit increases received between severance notification and Release Date will count as part of Base Pay. |
| Business Manager | An individual in a specific business area who has final approval of the activity discussed. |
| Functional Manager | An individual who manages an employee subject to the application of this policy. |
| HR Representative | An individual in Human Resources who is responsible for the business area and the activity discussed. |

SeveranceSupportPlan-Policy.docx
Version: 6

Internal Use Only
**Page 1**

Last Modified on/by: April 2016 MB
Content Maintained by HR and Legal

**⌐ DELUXE**

HUMAN RESOURCES
POLICY

## POLICY

An employee is eligible for this program if the employee's position is discontinued due to consolidation of operations, implementation of new technology, or reduction in work force.  Human Resources will be responsible for ensuring employee eligibility for severance.

An employee is not eligible for the Severance Support Plan if they:

- voluntarily resign, retire, or abandon their position prior to their Release Date,
- are involuntarily terminated (due to factors including, but not limited to, performance, discipline, or conditions of employment issues, etc.) prior to their Release Date,
  - are in formal discipline (see **Discipline Policy**) at their Release Date,
- have their scheduled Release Date rescinded due to a change in business needs,
- choose not to sign a Release,
- are moved to another work shift,
- are working in a business or subsidiary that is sold to another company or a functional group that is outsourced and are offered a position with the purchaser or the outsourced service provider. (The terms and conditions of the purchase or service provider agreement, not this Severance Support Plan, define any benefits available to an affected employee.)
- are offered employment at Deluxe or one of its subsidiaries or an outsourced service provider (where the service provider agreement does not provide applicable terms and conditions) that:
  - is within a 50 mile radius of their worksite while they were an employee, except in certain positions, i.e. sales, or other positions, where relocation is a condition of employment,
  - requires no material reduction in base pay, and
  - does not require a change to a dissimilar responsibility level
- are a temporary or seasonal employee at the Company or one of its subsidiaries,
- have fewer than six (6) months of continuous service immediately prior to their job elimination.

If an employee receiving severance payment is rehired anywhere within the Company or its subsidiaries, severance payments and benefits will end at the time of re-employment with the Company or its subsidiary. Any eligibility for future severance will be offset by any severance payments made to the employee in the previous one year period.

At the time of their separation in accordance with this plan, an employee will receive weekly/semi-monthly payments on the same schedule on which they receive their base wages.

Payments will begin at the next company pay date following the latter of: (1) the date on which an employee's employment is terminated in accordance with this plan or (2) twenty (20) days after receipt of a signed release from an employee if the employee has not rescinded the release.

Federal, state and local taxes will be withheld from each severance payment at the rate the company determines is required.

Outplacement training will be provided by internal resources or by a firm selected by the Company. Employees must start the outplacement benefit within 6 months of termination from the company. If an employee is unable to use the benefit in this timeframe, they must contact HR and receive approval from a Vice President of Human Resources to extend the timeframe.

An employee is expected to sign a Release and any applicable rescission periods need to have expired before being eligible to receive a severance support package from the Company or one of its subsidiaries.

The Company, or its subsidiaries that have adopted this Severance Support Plan, shall have the sole discretion, authority and responsibility to interpret the Severance Support Plan, and any communication related to it and to determine all factual and legal questions under the plan, including but not limited to, the entitlement of an employee to participate in the Plan and the amount of their benefits under the Plan.

**DELUXE**

HUMAN RESOURCES
POLICY

| Job Level | Severance Payments | Minimum Payments(1) | Maximum Payments | Benefit Continuation (COBRA) | Out-Placement | EAP Support(2) |
|---|---|---|---|---|---|---|
| Grades A - H Sales Grades SE – SH | One week of Base Pay for each full year of service | 4 weeks of Base Pay | 26 weeks of Base Pay | 18 mos. COBRA at full rates | Group Sessions (One Day) | Yes |
| Grades I – J Sales Grades SI – SJ | One week of Base Pay for each full year of service | 4 weeks of Base Pay | 26 weeks of Base Pay | 18 mos. COBRA at full rates | Group Sessions (Two days) | Yes |
| Grades K – L Sales Grades SK –SL | One week of Base Pay for each full year of service | 4 weeks of Base Pay | 26 weeks of Base Pay | 18 mos. COBRA at full rates | One month individual program | Yes |
| Grades M - N Sales Grades SM – SN | One week of Base Pay for each full year of service | 8 weeks of Base Pay | 26 weeks of Base Pay | 18 mos. COBRA at full rates | One month individual program | Yes |
| Grades O Sales Grades SO | One week of Base Pay for each full year of service | 8 weeks of Base Pay | 26 weeks of Base Pay | 18 mos. COBRA at full rates | Two months individual program | Yes |
| Grades P Sales Grades SP | One week of Base Pay for each full year of service | 17 weeks of Base Pay | 39 weeks of Base Pay | 18 mos. COBRA at full rates | Two months individual program | Yes |
| Grades Q - R Sales Grades SQ-SR | One week of Base Pay for each full year of service | 17 weeks of Base Pay | 39 weeks of Base Pay | 18 mos. COBRA at full rates | Six months individual program | Yes |
| Grade EX, XX, S,TV Sales Grades SS-ST | 9 months of Base Pay plus, if not employed, 3 Months of Base Pay continuation. If employed but at a rate less than most recent Company Base Pay, the difference between the Company Base Pay and current monthly compensation for 3 months. | 9 months of Base Pay | 12 months of Base Pay | 18 mos. COBRA at full rates | 12 months individual program | Yes |

Exempt and non-exempt part-time employees who work at least 20 hours per week, but no more than 32 hours per week, are eligible for a pro-rated severance support package for the job grade they are in at the time of separation. It does not include temporary or seasonal labor.

(1)Minimum payments are made to ensure that each qualified employee receives at least the stated minimum weeks of severance pay for their grade level

(2)If applicable

SeveranceSupportPlan-Policy.docx
Version: 6

Internal Use Only
**Page 3**

Last Modified on/by:  April 2016 MB
Content Maintained by HR and Legal

**⌐) DELUXE**

HUMAN RESOURCES
POLICY

## EXCEPTIONS

Any exceptions to this policy must have the approval of a Vice President of Human Resources.

## RESPONSIBILITY

### HR Representative
- To inform severed employee of features of the Severance Program.

### Functional Manager
- To work with HR Representative to determine the business cause for **Reduction in Force**.
- To work with HR Representative to identify affected employees who will be eligible for severance.

SeveranceSupportPlan-Policy.docx
Version: 6

Internal Use Only
**Page 4**

Last Modified on/by:  April 2016 MB
Content Maintained by HR and Legal

# EXHIBIT C

EMPLOYMENT AGREEMENT

AGREEMENT, made as of this 1st day of April, 2017, by and between, SAFEGUARD MARKETING SOLUTIONS USA, INC., a New York corporation, having offices at 12E 40th Street, 11th Floor, New York, NY 10017 ("SMS USA") and ALAN NAPOLI, an individual residing at 19 Treacor Street, Dix Hills, NY 11746 ("Employee").

W I T N E S E T H:

WHEREAS, Employee has been offered the position of Sales and Business Development Consultant of SMS USA.

WHEREAS, Employee is desirous of employment with SMS USA in such position; and

WHEREAS, SMS USA is willing to employ Employee, and Employee is willing to accept employment by SMS USA, subject to, and in accordance with, the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    **Employment of Employee.** SMS USA does hereby agree to hire Employee, and Employee does hereby agree to accept employment with SMS USA, as a Sales and Business Development Consultant of SMS USA, all upon the terms and subject to the conditions specified herein. In his capacity as a Sales and Business Development Consultant, Employee shall carry out the responsibilities and duties specified on **Schedule A** attached hereto and incorporated by reference herein. Employee shall devote his full business time and attention to the faithful performance of his responsibilities and duties hereunder and as are assigned from time to time by SMS USA.

2.    **Term.** The term of this Agreement shall commence as of April 1, 2017 (the "Commencement Date") and continue until March 31, 2019 (the "Initial Term"). The date on which Employee ceases to be employed by SMS USA, regardless of the reason therefore, is referred to in this Agreement as the "Termination Date". Unless either party elects by written notice to the other not to renew this Agreement prior to the expiration of the Initial Term, Employee's employment with SMS USA shall continue thereafter under the same terms and conditions hereof for a period of one (1) year. The Initial Term and any extension period of Employee employment is referred to herein as the "Term".

3.    **Employee's Compensation.**

     (a)    **Commission Payments.** Employee shall be paid commissions for sales of SMS USA's products to Assigned Accounts (defined below) based at the rate of thirteen percent (13%) of revenues for all orders placed during the Term. Commissions will be deemed earned by Employee upon products being shipped and invoiced by SMS USA. Commissions paid to Employee are subject to chargebacks in the event the invoice for which a commission was already paid to Employee remains unpaid for a period of one-hundred twenty (120) days. If payment on such invoice is eventually made, Employee will be entitled to repayment of the commission on the fifteenth (15th) day of the month following receipt of payment by Safeguard, except such commission will be reduced by a pro-rata share

1

of collection fees incurred by SMS USA (13%), if any, in connection with collecting payment on the subject invoices.

**(b)     Draw Against Commissions.** During the Term, SMS USA shall pay to Employee an annual draw against commissions in the amount of One Hundred Thousand Dollars ($100,000) per year. The draw is at the discretion of SMS USA and shall not be considered a guaranteed salary. The draw will be payable to Employee in semi-monthly installments of Four Thousand One Hundred Sixty Six and 67/100 Dollars ($4,166.67) (the "Draw"). The Draw will be paid to Employee on the fifteenth (15th) and last day of each month, or the following business day if such dates are not business days. Any additional commissions earned by Employee in excess of the Draw will be paid to Employee on the fifteenth (15th) day of the month in the month following the month in which the commission is earned. The Draw and the additional commissions earned by, and to be paid to, Employee are collectively referred to herein as the "Commission Payments." Any negative commissions i.e. Draw paid out higher amount than actual commissions earned by Employee in any month, are carried over to the following month and applied to any additional commissions earned that month. If commissions earned are lower than those paid as draw for 3 consecutive months, the following month(s) the draw will be reduced by such amount to reconcile to a zero balance. In the event of negative commissions after termination, the negative commissions will be deducted from any outstanding payments due to Employee.

**(c)     Bonus Payments.** Upon execution of this Agreement, Employee shall be paid a signing bonus in the amount of Twelve Thousand Five Hundred Dollars ($12,500). If Employee remains actively employed on the one (1) year anniversary of this Agreement, Employee shall be paid an additional bonus payment of Twelve Thousand Five Hundred Dollars ($12,500).

**(d)     Withholdings.** SMS USA shall withhold from the Commission Payments and any bonus payments all sums required by federal, state and local laws, including, but not limited to, taxes, social security and all other appropriate sums.

**(e)     Employee's Participation in Benefit Plans.** Employee shall be entitled during the Term to participate in any health and accident plan, 401k savings plan or other retirement plan offered by SMS USA to its employees, from time to time. Participation by Employee in any such plans shall be subject to the terms and conditions of such plans and arrangements.

**(f)     Health Care Plan Reimbursement.** Until such time as SMS USA offers a health insurance plan in which Employee may participate, SMS USA will reimburse Employee for seventy five percent (75%) of the health care insurance premiums, including the premium for continued health insurance coverage under COBRA, to be paid by Employee. The reimbursement to Employee hereunder will be made with the Commission Payments payable on the first (1st) of the month, and shall not exceed One Thousand Dollars ($1,000) per month. Any future plan will also be capped at the lesser of 75% of the cost or $1,000 per month.

**(g)     SMS USA Provided Equipment.** SMS USA will provide Employee with a company cell phone (smart phone) and laptop previously provided by Debate upon closing to carry out the performance of Employee's duties under this Agreement. Company provided equipment will be returned to SMS USA in proper working order within 3 business days upon termination of this agreement

2

(b)     **Expense Reimbursement.** SMS USA will reimburse Employee for reasonable and customary expenses incurred by Employee during the Term in the performance of Employee's duties hereunder, including, without limitation, mileage reimbursement for travel at the approved IRS rates. The Employee shall furnish to SMS USA such receipts and records as SMS USA may require to verify the foregoing expenses no later than thirty (30) days from accrual.  Any delay in issuance of such receipts by Employee will not be subject to interest payments due on Employee's credit card by SMS USA and will be reimbursed to Employee within 3 business days.  Any business expense with a cost of over Five Hundred Dollars ($500) must be approved by SMS USA prior to expenditure.  Monthly expenses in excess of $2000 for office supplies and travel and expenses must be approved by SMS USA in advance.

(l)     **Paid Time Off and Holidays.** Employee shall be entitled to five (5) weeks of paid time off ("PTO") for each year of the Term.  The PTO shall vest on the Commencement Date and on the first day of each subsequent year thereafter. The PTO must be used by Employee within the year in which it vests, and may not be carried over to any subsequent year of the Term.  Employee will not be paid for unused PTO at the time of his termination of employment.

4.  **Business Operations & Marketing Expenses**

All business operations and marketing expenses are at the sole discretion of SMS USA. All employee requests, including, but not limited to, mailing, promotional materials, samples, tradeshows and other business activities with associated costs, must be approved in advance, and be compliant with our brand standards.

5.**Termination.**

(a)     This Agreement, and Employee's employment with SMS USA, may be terminated by either party by written notice to the other, at any time, with or without any notice.

(b)     Employee's employment with SMS USA shall immediately terminate upon the death of Employee.

(c)     After the termination of Employee's employment for any involuntary reason, Employee shall be entitled to receive (i) all Commission Payments earned through the Termination Date, (ii) reimbursement for all business expenses incurred by Employee prior to the Termination Date, and (iii) severance in the amount of $75,000, payable subject to, and in accordance with, the provisions of paragraph 5(d).

(d)     Upon termination of Employee's employment by SMS USA other than "for cause", Employee shall be paid severance by SMS USA in the amount of the Draw for a period of nine (9) months after such termination.  No additional relief or remedy will be payable in the Employee beyond the terms of severance.  The severance payments will be paid to Employee in the same manner as the Draw was paid to Employee prior to the termination of Employee's employment (i.e. on 15th and last day of each month).  For purposes of this Agreement, "for cause" shall mean:  (i) theft, embezzlement or fraud by Employee; (ii) Employee's conviction for, or plea of guilty to, a felony, or (iii) breach of Employee of any of the material provisions of this Agreement (iv) professional misconduct, (v) Failure to cover draw for 6 calendar months, which may be considered non performance; (vi) Failure to successfully execute on Job Description as outlined in Schedule A.

3

6.    **Assigned Accounts.** Employee will be initially assigned and receive Commission Payments for sales to all customer accounts acquired by SMS USA in connection with the purchase of assets from Safeguard Acquisition, Inc. ("Assigned Accounts"). After the first anniversary of this Agreement, SMS USA will have the right to assign any Assigned Accounts to other sales people of SMS USA.

7.    **Confidential Information.** Employee agrees that he shall not use for any purpose or disclose to any person or entity any Confidential Information (as defined herein) acquired during the course of employment with the SMS USA. The term "Confidential Information" as used in this Agreement shall mean any information SMS USA now has, or may in the future develop or acquire, relating to any ideas, concepts, data, or other information which in whole or in part is or will be considered trade secrets and/or proprietary and confidential, including, but not limited to, records, lists, know-how and knowledge of SMS USA's customers, contact information, suppliers, services, products, methods of operation, marketing strategies, processes, techniques, pricing matrix, financial conditions, profits, costs, sales, net income, and indebtedness, as the same may exist from time to time and specifically including any and all pricing information, technical data, information, know how or other materials that Employee is provided by SMS USA.

Employee further agrees and acknowledges that all documents, property, notes, materials, electronically stored information or any other Confidential Information provided, acquired or otherwise obtained through employment by SMS USA constitute the property of SMS USA and must be returned to SMS USA on or before Employee's last date of employment.

8.    **Non-Solicitation.**

(a) **Acknowledgements.** Employee understands that the nature of Employee's position gives him access to and knowledge of Confidential Information and places him in a position of trust and confidence with SMS USA. The Employee further understands and acknowledges that SMS USA's ability to reserve these for the exclusive knowledge and use of SMS USA is of great competitive importance and commercial value to SMS USA and that improper use or disclosure by the Employee is likely to result in unfair or unlawful competitive activity.

(b) **Non-Solicitation of Customers.** Because of SMS USA's legitimate business interests and the good and valuable consideration offered in this Employee, for a period of two (2) years from the termination of Employee's employment with SMS USA, Employee (a) will not, directly or indirectly, through an immediate family member and/or on behalf of any other person, entity or firm, solicit, sell to, induce, attempt to sell to or induce, except business from, perform services for, and/or consult with, any SMS USA customers relative to any products that are available through Safeguard (b) will not, directly or indirectly, through an immediate family member and/or on behalf of any other person, entity or firm, willfully dissuade or discourage any person associated with any SMS USA customers from conducting business with SMS USA, and (c) will not, directly or indirectly, through an immediate family member and/or on behalf of any other person, entity or firm, disrupt or interfere with, or attempt to disrupt or interfere with, any business or other dealings between SMS USA and any of its customers.

(c) **Remedies.** In addition to all of the remedies otherwise available to SMS USA by law, including, but not limited to, recovery from Employee of damages SMS USA shall have the right to injunctive relief to restrain and enjoin any actual or threatened breach of any of the provisions of this Agreement without the necessity of posting any bond or other security, the Employee acknowledging that any breach will cause irreparable harm and damage to SMS USA. Further, SMS USA will have its right and remedy to require Employee to account for and pay over to SMS USA all compensation,

4

profits, monies, accruals, increments or other benefits derived or received by Employee as a result of any transactions constituting a breach of any of the provisions of this Agreement. SMS USA will have the right to recover reasonable costs and attorneys' fees incurred in the enforcement of this Agreement. All of SMS USA's remedies for breach of this Agreement shall be cumulative and the pursuit of one remedy shall not be deemed to exclude any other remedies.

(d)   No Waiver. No failure of SMS USA to require, and no delay by SMS USA in requiring, Employee to comply with any provision of this Agreement will constitute a waiver of SMS USA's right to require Employee's compliance with this Agreement.

(e)   Reasonableness of Restrictions. Employee has carefully read and considered the provisions hereof and, having done so, agrees that the restrictions set forth in this Agreement are fair and reasonable and are reasonably required for the protection of the interests of SMS USA. Employee represents and warrants that the enforcement of these covenants shall not preclude the Employee from earning a living.

(f)   Separate Covenants. This Agreement shall be deemed to consist of a series of separate covenants. Should a determination be made by a court of competent jurisdiction that the character, duration or other portion of any provision of this Agreement is unreasonable in light of the circumstances as they then exist, then it is the intention and the agreement of SMS USA and Employee that this Agreement shall be construed by the court in such a manner as to limit or reduce only those restrictions so as to be enforceable to the extent compatible with applicable law and so as to assure SMS USA of the intended benefit of this Agreement. If, in any judicial proceeding, a court shall refuse to enforce all of the separate covenants deemed included herein because, taken together, they are more extensive than necessary to assure SMS USA of the intended benefit of this Agreement, then it is expressly understood and agreed by SMS USA and Employee that those of such covenants which, if eliminated, would permit the remaining separate covenants to be enforced in such proceeding, shall, for the purpose of such proceeding, be deemed eliminated from the provisions hereof. In the event of a violation by Employee, the term of each such covenant so violated shall be automatically extended for a period of two (2) years from the date on which Employee permanently ceases such violation or for a period of two (2) years from the date of the entry by a court of competent jurisdiction of a final order or judgment enforcing such covenant, whichever period is later.

(g)   Prospective Employers. Employee acknowledges that SMS USA may notify anyone employing, or evidencing an intention to employ, Employee, including, as to the existence and provisions of this Agreement and may provide any such person, business or organization a copy of this Agreement.  Employee agrees that for a period of two (2) years after termination of Employee's employment with SMS USA for any reason, Employee will provide SMS USA the identity of any employer Employee applies to and/or accepts employment from along with Employee's job title and principal job duties with any such employer. Employee further agrees to provide a copy of this Agreement to anyone who employs Employee within two (2) years of the termination of Employee's employment with SMS USA.

5

5.   Miscellaneous.

(a)   Notices. All notices and other communications permitted, required or provided for under the terms of this Agreement shall be made in writing, and shall be deemed adequately delivered if delivered by hand or by the mailing of the notice by first class United States mail, to the parties at their respective addresses set forth above or such other address as any party may from time to time notify the other parties in the manner provided herein. Notices delivered by hand shall be deemed given and received when actually delivered. Mailed notices shall be deemed given when deposited in a mailbox or U.S. Post Office and received two (2) days after mailing.

(b)   Governing Law; Dispute Resolution. This Agreement shall be governed by the laws of the State of New York, without giving effect to conflict of laws principles. Any claim or dispute, whether based on contract, tort, statute or any other legal or equitable theory, arising out of or relating to this Agreement or the transactions contemplated hereby ("Dispute") shall be brought in the federal or state courts located in the County of Suffolk, State of New York. Each of the parties hereto expressly submits to the exclusive jurisdiction of such courts and waives any claim of improper jurisdiction or lack of venue in connection with any claim or controversy that may be brought in connection with this Agreement. Each party hereby agrees that such courts, as applicable, shall have in personam jurisdiction with respect to such party, and each party hereby submits to the personal jurisdiction of such court.

(c)   No Limitations. Employee hereby represents that the Employee is not bound by the terms of any agreement with any previous employer or other party to refrain from using or disclosing any trade secret or confidential or proprietary information in the course of his employment with SMS USA, to refrain from competing, directly or indirectly, with the business of such previous employer or any other party, or to refrain from soliciting employees, customers or suppliers of such previous employer or any other party. Employee further represents that his performance of all of the terms of this Agreement and performance of his duties as an employee of SMS USA do not and will not breach any agreement with any joint employer or any other party to which the Employee is a party (including, without limitation, any non-disclosure or non competition agreement), and that the Employee will not disclose to SMS USA or induce SMS USA to use any confidential or proprietary information or material belonging to any previous employer or others.

(d)   Remedies. No remedy herein conferred upon or reserved to a party is intended to be exclusive of any other available remedy, but each and every such remedy shall be cumulative and in addition to every other remedy given under this Agreement or in connection with this Agreement, any other agreement, and now or hereafter existing at law or in equity.

(d)   Headings. The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

(e)   Governing Law. This Agreement and all obligations of Employee hereunder shall be construed and enforced in accordance with the laws of the State of New York without regard to the principle of the conflicts of law.

The parties hereto have duly executed and delivered this Agreement all on the day and year first above written.

6

SAFEGUARD MARKETING SOLUTIONS USA, INC.

By:

Title: P R E S I D E N T

EMPLOYEE

Ciaer Negali

# EXHIBIT D



**Schwartz Ettenger**, PLLC
Experience you need. Results you want.

631-777-2401 • Fax: 631-777-2402
445 Broad Hollow Road, Suite 205, Melville, NY 11747

April 5, 2017

Mr. Alan Napoli
L.A.M. Enterprises, Inc.
19 Trescott Street
Dix Hills, NY 11746

**Re:  General Corporate**

For Professional Services from March 1 through March 31, 2017:

Consultations with clients relating to Agreements with
Deluxe; exchange emails; review correspondence          10.50 hrs @   $425.00

**TOTAL DUE:**                                          **$4,462.50**

l:\bills\napoli.4.5.17.bill [gen corporate].docx

# EXHIBIT E

**Oliveri, Jason J.**

| | |
|---|---|
| **From:** | lenazip@aol.com |
| **Sent:** | Monday, September 18, 2017 11:52 AM |
| **To:** | Schilling, Laura |
| **Subject:** | Re: Checking account |

Laura,

I believe the difference is the accountants invoice.  Like I said before.  It should be a deluxe invoice, because we didn't ask to be sold and it was Alan's negotiations with Deluxe for his exit from Deluxe to Safeguard.  As far a I'm concerned Kevin could pay it.  It wasn't caused by us.


Lena

-----Original Message-----
From: Schilling, Laura <laura.schilling@deluxe.com>
To: lenazip <lenazip@aol.com>
Sent: Mon, Sep 18, 2017 11:33 am
Subject: RE: Checking account


Hi Lena,

Thank you for the head's up! I spoke with our Treasury team this morning and they were able to schedule a transaction for 9/19 for the balance.

One question for you. The ending cash sheet from August showed a balance of $23,209.33. What would be causing the difference of $4462.50? Were there additional payables to close out or payments made in September? If so, could you provide the documentation?

Thank you,
Laura

Laura Schilling | Accounting Manager
p 651-787-1053 | laura.schilling@deluxe.com <mailto:laura.schilling@deluxe.com>
deluxe.com <http://www.deluxe.com/>

Deluxe®. For the love of small business.SM


From: lenazip@aol.com <mailto:lenazip@aol.com>  [mailto:lenazip@aol.com <mailto:lenazip@aol.com?> ]
Sent: Monday, September 18, 2017 8:58 AM
To: Schilling, Laura <laura.schilling@deluxe.com <mailto:laura.schilling@deluxe.com> >
Subject: Checking account


Message originates from outside our organization. Use caution with correspondence, attachments or hyperlinks (URLs).

1

Laura,

I'm planning on closing the L.A.M. checking account this week.  You have $18,746.83 to remove from it.  Please let me know when you are planning on removing it.

Thank you!

Lena